Good morning, Judge Pius, Judge Fletcher, Judge Newton. My name is Stephen Yagman. I represent the plaintiff. I would much rather argue the last case on choice of law, which is much more interesting in the prosaic matters I'm going to present here. And it feels kind of trivial in a way in front of the first three cases I heard here this morning regarding fighting to stay inside the United States of America, to come in here and argue, one, about diction, the diction, the use of the word oppressive or not in punitive damages instructions in the circuit, and second, that I should be paid more money for what I did. I've said everything that I want to say in the briefs except for two things, and they are the One, the reason I'm arguing for the use of the word oppressive and the punitive damage instruction that would be given in Section 1983 cases is because it's important to plaintiffs. The words in there of necessity are arbitrary to an extent, malicious, oppressive, deliberate indifference. The reason that oppressive should be in there beyond the Fontilla case, Fontilla v. Carter from the circuit from 1978, is because that's what I always argue and that's what most occurs in civil rights cases. You have conduct that, if anything, in a context of punitive damages, is oppressive. It's usually not malicious. It's not because a police officer has spied real will, although sometimes it is. Why can't you make that argument with reckless indifference? It's a little different because the condition. Explain to me in the context why that argument doesn't work. This instruction which used reckless indifference as well as malicious. Why can't you make the oppressive argument within the context of that instruction? For this reason, oppression is defined within the instructions, the old Devin and Blackmore instruction. And oppressive is defined at least in part as conduct that occurs because a person by virtue of her or his superior position or advantage does something to a person who has less advantage or less of a position. And that's the argument. Well, the harm here was use of excessive force. I'm sorry? The harm here was use of excessive force. In this particular case, it was. However, it was done because the police were in the position they were in. They were able to go in there. They were able to force Mr. Dang to get down on his knees and start to open the safe. They didn't think about whether or not there might be a gun inside. And then they saw the gun inside the safe. And then they beat him up pretty badly. I mean, to the extent where when he was in the hospital, blood was coming out of his urethra from a shot, a kick he got in the groin. They were able to get away with that because their position, their station was higher than his. If they hadn't been police officers, he might have been able, if they had been robbers, he might have been able to think he could have fought back. Maybe he wouldn't have been as harmed. You didn't provide us with a copy of your argument before the jury on the punitive damages issue. No, I didn't. I didn't think it was necessary. If it's something that would be helpful. Well, it would be nice to see what the, you know, how the facts played into the argument. I can certainly. I mean, you started your argument here by saying that this is necessary for plaintiffs. I'm telling the truth. But we have to decide whether or not here the district court abused its discretion. I mean, I could get, I could use an analogy to the choice of law argument from the last case, which I think in California is minimum impairment. I don't think California uses the governmental interest test. The question is, who would be impaired were the word oppressive in there? It was always in there before, and then somebody arbitrarily decided to change it. It should be in there, even if it isn't decided in this case that it should have been in there for future. It should be decided that it ought to be in there. The Ninth Circuit puts out these model instructions. I guess they're done by committee because, and they're not always based on cases. Why shouldn't Fontilla versus Carter control here? It's the only case in the Ninth Circuit. The old Devon and Blackmore instruction had the word oppressive. And I've belabored this point to death now. It's not a huge issue in the course of human experience. It's a nuts and bolts kind of issue, and it isn't harmful for defendants to have the word oppressive in there, along with the other operative terms, malicious, oppressive, deliberately indifferent, whatever the case may be. Actually, it's not deliberate indifference. I guess it's wanton. This is the third word that's put in there. Second, why am I in here arguing for a higher hourly rate when my father, when he retired in 1967, was making $175 a week as a dental technician, and I got awarded $400 an hour, which to me is an enormous amount of money because of where I come from. And it's because civil rights plaintiff's lawyers always have to come into federal court and beg for money. I mean, they end up being treated, like judges, as though they were Remora on a shark, as though they're parasites. And you come in and you ask for money, and whatever it is, they cut it down. It should be done the way it's done in usual commerce. It should be what the market bears. Evidence was submitted, and somehow it always gets cut down. It got cut down in the Saman case. It always gets cut down. It should be what a lawyer of comparable training, experience, ability would get out in the open market. And yet it never is. There's always a way that district judges find, with the rare exception of Judge Marianna Felser, and I always thought that was because she came from a big firm where there was a lot of money and big numbers didn't scare her. But most lawyers don't come from that background. They work their way up through the ranks. They're in public service. Some were professors, as Judge Noonan, I know, was. And they get shocked by a large number like $550 an hour. But it should be what the market bears, and it isn't, unless there are any questions. Well, one of the declarations that was submitted here in support of your request had a range of $400 to $550. That was Brian O'Neill's declaration. And, yes, that's true. But then why do the judges always pick the low end of the range? And my friend Carol Watson, I put in her declaration. Maybe I shouldn't have. I had always told her her rate was too low. She's retired now. Yeah, that was the range that was put in. But I think a preponderance of the evidence brought the amount up higher than the minimum amount. Judge Feese was gracious enough, when I raised the issue, I think he had first awarded $350 or $375. He reconsidered it, which was a fair and decent thing to do. And I don't want to seem greedy coming in here and asking for a higher rate. It's more a matter of principle, it really is, than the amount of money in this case. This circuit always seems to go along with whatever the district judge does. And the district judge in Section 1983 in Bivens, not Bivens actions, Section 1983 actions, is always at the low end of the range. It just seems unfair to me. Let me ask you about the cut in the number of hours. He cut back the number of hours that he allowed. Now, is there a problem there? I believe there is. It's set forth in the brief. I don't think it should be done that way. I think it should be done the way it's done out in the open market. And I think the reason that district judges treat it like that, and the way this court generally goes along with it, is it's a pain in the neck to deal with it. Well, I'm interested in whether your records were substantiated for the number of hours that you submitted, and whether those were necessary hours, and whether the district court abused his discretion in cutting back on that. I think the abuse was because there was a record that indicated that the hours on the claims on which there wasn't success weren't billed for. And that was the truth. That was the problem. And second, the claims were all related. It was all the same incident that took place in a few minutes. It was the same nucleus of operative facts as lawyers say. So I don't think that was fair or right. And I don't think reduction should be done by percentage. That's not the way it's done out in the open market. And plaintiff civil rights lawyers shouldn't be treated differently. Well, but it's difficult for the district court judge to, if you don't have detailed, very precise records about how the lawyer spent his or her time. But he did. It's very difficult. Well, you look at your records, and they're not all that clear because it's generic kind of discovery. It doesn't say discovery with respect to, you know, ex-defendant. It's not required. Well, but I'm just telling you, it makes it difficult for the district court judge. And so when the district court judges are confronted with this, they will do a percentage. You know, they have to tell us why they're doing that. But what are they supposed to do?  Well, they're not expedient. It's your burden to come. It's the plaintiff's burden to come forward with, you know, with a showing of how you spent your time. And I don't think that's asking too much because most of the lawyers, you know, have little difficulty in doing that. I think the records were more than adequate because there was the statement that the time with respect to the other claims wasn't listed. It would, therefore, be redundant to say this was discovery with respect to A when you've already said I'm not billing for B. It's redundant. If there was any potential problem here, at least with what Judge Fees did, it's not clear that he applied the correct standard in assessing whether or not he should reduce fees for the claims that you did not prevail on. That's the plaintiff's stronger claim. There's no question about that. And, again, I don't come in here to be greedy. It's a matter of principle. And as I said when I started out on this argument, it's a pain in the neck. If I had to start figuring out somebody's fees, and I do in our firm sometimes, it's a miserable job. I don't want to do it. It takes too much time. It's hard to figure it out. But that doesn't mean you'd be expedient. You have to do it the right way. And I don't think Judge Fees, who I think is an excellent judge in civil rights cases for defendants and for plaintiffs, did it the right way in this particular instance. And were Judge Fees going to? I'll leave that aside. I have nothing more to say unless there are any questions. Thank you. Good morning. I am Cal Saunders. I'm a deputy city attorney for the city of Compton representing Officer Cross. In this case, regarding the ‑‑ you already know the facts of this case. I won't repeat the facts of the case and the number of people that were sued. In this case, regarding the jury instruction on punitive damages, I do not believe Judge Fees abused his discretion by using the model jury instruction of the Ninth Circuit. I'm not sure that the abuse of discretion applies when we're trying to decide whether the law requires the language that's being asserted by the defendant. If it's a matter of just how you state or phrase your instruction, that's a matter of abuse of discretion. But if it is a matter of what the law requires, then we do it to no vote. Isn't that right? I believe that you may be right, Your Honor. As to I believe the ‑‑ I guess it says Smith v. Wade. Did Judge Fees, in considering this matter, he did read the Fontella v. Carter and Smith v. Wade decision. And he, in fact, believed in the exercise of his good judgment that the instruction on oppressive was not necessarily required in this particular case. I guess the question would be whether there was evidence that would amount to oppression. And if so, is it not necessary to instruct, as we have said, are the elements for punitive damages? I think in this particular case, Your Honor, it would have been very helpful had the appellant designated the examination and cross-examination of the appellant and the police officers so this Court would have a full record to see the context in which the use of force took place, to see the positioning of the bodies, to know exactly what was the context. So it could be in a position to decide whether oppression. Well, we're not limited to the excerpt record. We're entitled to look at the whole record. If the deposition was filed, was it? No, I was talking about the testimony. At the trial. At the trial. Yeah, the part of the trial transcript was not transcribed. No, it was not. It was not transcribed? No, Your Honor. Okay. And that's why I asked Mr. Yagman about just the oral argument at the time the issue of punitive damages was presented to the jury. There was the transcript of that argument on why punitive damages should be awarded was not transcribed. So unfortunately, in view of that fact, the district court judge was in a better position, having heard all the testimony, knowing the context of the use of force, knowing the positioning of the bodies, et cetera. He was in a better position to determine whether or not to give the oppressive instruction. In fact, he pointed out and was trying to ascertain if, in fact, if we're talking about oppression in this case, should he have applied the California definition of oppression, which was different than the definition of oppression suggested in the suggested jury instruction. California definition of oppression is contained in Civil Code 3294, indicating oppression means despicable conduct that subjects a person to cruel and unusual, unjust hardship, and conscious disregard of that person's rights. The question remains whether if he were to give such an instruction, would he give that instruction, and in view of that standard in California, would the conduct testified to at trial rise to the level of oppression as defined by California law? Well, we give a definition of oppressive conduct in the Carter case, do we not? There was a, yes, there was a definition in the Carter case, but I don't believe in that case the appellate court ruled upon whether, I don't think it was contested whether that was a proper or improper jury instruction. In fact, had Judge Feist decided to give this instruction, I do not believe I could have come in and opposed it as an abuse of discretion. Conversely, as I said, the issue of whether that was a proper or improper instruction as to the use of oppression in the Carter case was never reached. The Carter case was decided on another issue regarding the failure to include language at the beginning of the instruction which the judge said he was going to give. Well, we stated as fact what oppressive conduct is in the Carter case. Yes, Your Honor. I'd also like to point out the jury instruction regarding the oppressive kind. Oppressiveness, he pointed out it was an act or a failure to act, and in this case this was an excessive force case. It didn't arise, and the underlying liability was not determined by a failure to act, but rather an action itself. Well, the Carter case says an act or a failure to act, so it has it both, is oppressively done if done in a manner, and then it goes on. Right, but in this particular case the facts were different than in the Carter case. Your Honor, this is an excessive use of force case. This was not a determination that the failure to do something on the part of the police officer was an excessive use of force, but the actual conduct of the police officer was an excessive use of force. That's why that part of the instruction would have been inappropriate in my view. Were you at the trial of this case, Mr. Sonks? Yes, Your Honor. You could have saved yourself a lot of trouble if you'd said that oppressive ought to go in there. Yes, Your Honor. Did Mr. Yagman make an oppressive argument on the punitive damages nonetheless? I believe that he argued that. That's all right. We don't know. Also regarding this proposed instruction, I'd like to point out that omitted from the instruction that Mr. Yagman proposed was that language contained in the model jury instruction and in a Devitt and Blackmore instruction regarding punitive damages, if any, should be an amount sufficient to fulfill their purpose, but should not reflect bias, prejudice, or sympathy toward any party. That part of the instruction from both Devitt and Blackmore and from the model jury instruction was omitted from his instruction. That didn't appear to be the reason why Judge Fies didn't give that instruction, though. Yes, I just pointed that out. Had he decided to give that instruction, he could have easily. And if you requested it, it would probably be a fair thing to say that the judge would have added it. Now, as to the Attorney Fies issue, I don't believe the judge abused his discretion. In that case, you were correct. There is a two-part analysis in Hensley v. Eckerhart. The district court should, when there are successful claims and unsuccessful claims, the district court does have to look and determine whether the claims were related or unrelated. It didn't look to me like Judge Fies applied the correct standard, though. This whole incident arises from one set of facts. Only with respect, I think it's the chief, Mitchell, who was added as a defendant. And he apparently wasn't there and didn't have anything to do with this. Right, Hurey Taylor. Apparently he was on – he was even in retirement. Yeah, Hurey Taylor. But the other defendants and the other claims that were kicked out, they all arose from this incident that took place. Right. The illegal – the alleged illegal seizure, the entry, the search, all those claims that were kicked out on summary judgment, they all arose. And the defendants who were involved in the depositions, they all – it was all part of the same incident. And Judge Fies, I think, standard was did those claims facilitate the claim that prevailed, which didn't seem to be correct. Okay. Well, as you pointed out, or if you've read the cases and there is supposed to be a two-part analysis that is, there's supposed to be a determination whether those claims are related or unrelated. Even if they're related, as you point out, in Hensley v. Eckerhart, there still can be a reduction based upon the lack of success in the case. I think – I think the Supreme Court in that case, the standard or the sentence they used was where a lawsuit consists of related claims and there has been limited success, the district court should award only that amount of fees reasonable in relation to the results obtained. So they pointed out even though there are related claims, that there could still be a reduction based upon the lack of success on – Well, he essentially said they were not related. Right. But I'm saying – Well, we don't know what he would do if he applied the correct standard. Okay. That's – I will, unless there are further questions, that is all I have to say this morning. I think so. Thank you, Mr. Saunders. Yes, Your Honor. I didn't argue oppression, and the reason I didn't argue it was at least to preserve it on appeal, because I had decided at that point in time when the instruction was refused that that was where it was going to go. And I was concerned that if I argued oppression, that it might moot the issue on appeal. I'm happy, if I can get permission to do it, to submit to the court that part of the transcript, as part of a Rule 28J submission, if it would facilitate disposition of this issue. It didn't occur to me when I was preparing the appeal that I would need that. It seems I may have made a mistake from what I've heard here this morning. Second, there's no relevance to nor would there have been any reason at all to use a California punitive damages instruction. I don't know what the basis would be for that, and I don't believe there is any. There was some discussion in the transcript in front of Judge Feese when his ruling, and somebody looked at Bagi, and he said, well, this is different, and it's a higher standard. I don't think Bagi applies, because we've got a federal claim in federal court, so federal law applies and not California law, and nor would it even apply under the assimilative laws provision of 42 United States Code Section 1988A, and even if it were potentially applicable under the assimilative laws provision under Martinez v. California, which I think is found in 444 U.S., and Gilroy v. County of Orange, which is found in volume 734 of the federal report. Second, you wouldn't apply it if it was contrary to purposes of California law. There's also a district court case on that called Garcia v. Whitehead that Judge Pregerson, the younger, wrote on the same issue. Last, I think an issue is, was there a basis for punitive damages instruction? I think that's the issue. I don't think the issue is, was there a basis necessarily for use of the word oppressive in that instruction. Having met the threshold burden that convinced the district court that there was a factual predicate for the legal conclusion that such an instruction should be given, I think then it's warranted that the correct instruction be given, because there's a range of predicates, malice, wantonness, and oppression. But for some reason, for the last four or five or six or seven years, district judges, at least in the Central District of California, won't use the word oppressive in there. I don't know if that's because they're relying on the model instruction. They rely on the model instructions. You know, I think that, and I think I'm right about this, and there are very few things that I'm certain I'm right about, but maybe I'm wrong. It sounds like Professor Irwin Corey is speaking about something. The Ninth Circuit doesn't speak through model jury instructions. It speaks through its dispositions rendered by panels of the court. And while those model jury instructions may provide a point of convenience or economy for district judges, when the instructions are wrong, they shouldn't pay any attention to them. Or when there's a case from this court, like Fontilla v. Carter, that's been around for, what, 26 years, that says differently, district judges shouldn't all of a sudden attach themselves to model jury instructions, as many of them do. I think it would be a good idea, and I highly recommend it for what little the recommendation is worth, that this court do away with those model jury instructions. They just cause trouble, and I don't think they do anything except make it more expedient for judges to find instructions. They're fine on general instructions. I don't think in 20 years I've ever even participated in a discussion on settlement of instructions on general instructions. It doesn't make any difference what they say, basically. They're all neutral. But you've got a substantive element here, and the substantive element is oppressiveness. It ought to be in there, and if it isn't in there in this case, it ought to be in there in future cases, so that when a plaintiff's lawyer says, I'd like the word oppression in there, the judge says, yes, there's Ninth Circuit law on that, and I'm going to put it in, unless there are any questions. I can't think of anything else to say. Thank you, Mr. Yagler. ACTING COUNSEL. The matter stands submitted.
judges: B. Fletcher, Noonan, Paez